20198sborgs

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------------x

 3   UNITED STATES OF AMERICA

 4
                 v.                        19 CR 224(VB)
 5
                                              SENTENCE
 6
     KEITH BORGE,
 7
                     Defendant.
 8
     ------------------------------------x
 9
                                           United States Courthouse
10                                         White Plains, N.Y.
                                           August 28, 2019
11

12

13

14

15   Before:  THE HONORABLE VINCENT L. BRICCETTI, District Judge

16

17

18                            APPEARANCES
19

20   GEOFFREY S. BERMAN
          United States Attorney for the
21        Southern District of New York
     JAMES McMAHON
22   DANIEL LOSS
          Assistant United States Attorneys
23

24
     LEE DAVID AUERBACH
25        Attorney for Defendant
```

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

20198sborgs

1          THE DEPUTY CLERK:  In the matter of the United States

2     of America v. Keith Borge.

3          Will all parties please note your appearance for the

4     record.

5          MR. McMAHON:  Good afternoon, your Honor.

6          James McMahon and Daniel Loss, Assistant United

7     States Attorneys for the United States.  We are joined at

8     counsel table by Anthony Raguso, who is a special agent with

9     the IRS CI.

10          MR. AUERBACH:  Your Honor, Lee David Auerbach,

11     Auerbach Law Group, P.C., for the defendant, who is sitting at

12     counsel table, Keith Borge.

13          THE COURT:  Welcome, everybody.  Have a seat.

14          This matter is on for sentencing today, the defendant

15     having pleaded guilty to two counts of a felony information.

16          It was an information, not an indictment.  Am I right

17     about that?

18          MR. McMAHON:  Yes.

19          THE COURT:  Yes, it was an information.

20          Count One was willful failure to pay over payroll

21     taxes to the IRS.  Count Two was securities fraud.

22          I've reviewed the following materials in preparation

23     for sentencing:  The revised presentence report dated July

24     10th, 2019 prepared by Probation Officer Ashley Geiser; the

25     plea agreement dated February 25th, 2019; defense counsel's

20198sborgs

sentencing memorandum dated August 13th, 2019 as well as a

number of letters and other materials attached thereto,

including a letter from the defendant.  I also, on June 29th --

well, I don't know if that was the exact date, but I received a

letter dated June 29th, 2019 from a Sister Beth Dowd.  It came

directly to me.  I forwarded it to both counsel by e-mail.

Just confirm for me that you received that, please.

Mr. McMahon?

MR. McMAHON:  Yes, your Honor.

MR. AUERBACH:  Yes, your Honor.

THE COURT:  Okay.  It wasn't included in either of

your sentencing submissions.  I think it was generally in favor

of Mr. Borge, although I'm not entirely clear.  But, in any

event, I've reviewed that, and I'll have that letter docketed

because it should be made a part of the record.

Also, I received a letter from defense counsel.  Hold

on a second.  Actually, I received a letter dated August 27th

and an attached proposed restitution order from the government

and then, on August 28th, I received a letter from defense

counsel, which is not on ECF.

Or is it?  It wasn't when it came to me.  I think it

came by e-mail.  I don't know why you would do that.  That's

how you file documents.

MR. AUERBACH:  Your Honor, it was intentionally filed

under seal.  In accordance with your part rules, that's what we

20198sborgs

1    were supposed to do.

2              THE COURT:  A response to an application for

3    restitution?  Why would that be filed under seal?  I'm sorry.

4              MR. AUERBACH:  I didn't want to highlight the

5    existence of the restitution order.

6              THE COURT:  Why not?  It's a part of sentencing.

7              MR. AUERBACH:  I understand that, but the --

8              THE COURT:  Well, anyway, it's going to be docketed

9    publicly.  Okay?  Actually, you're going to docket it

10   publically.

11             You don't make any reference in your letter to any of

12   the victims names, correct?

13             MR. AUERBACH:  Correct.

14             THE COURT:  That's the sealed part.  But the fact of

15   restitution, that's not sealed.

16             MR. AUERBACH:  The proposed order wasn't even

17   docketed.

18             THE COURT:  Because it includes the names of all the

19   victims.

20             MR. AUERBACH:  I understand that, your Honor.

21             THE COURT:  There's a difference between stuff that

22   is private and stuff that isn't.  What you submitted to me

23   wasn't.  There's nothing private about that.

24             MR. AUERBACH:  It will be taken care of this

25   afternoon.

20198sborgs

|   |   |
|---|---|
| 1 | THE COURT:  We only seal things when it's absolutely |
| 2 | essential that it be sealed.  The default is everything is |
| 3 | public.  Even Ms. Dowd's letter.  I'm going to put it on the |
| 4 | public docket.  Maybe she thought that she could just write to |
| 5 | me and have a little private conversation.  We don't do that. |
| 6 | Okay? |
| 7 | MR. AUERBACH:  Yes, your Honor. |
| 8 | THE COURT:  That's why I sent it to you and to |
| 9 | Mr. McMahon and that's why I'm going to put it on the docket. |
| 10 | I thought it might show up in your sentencing memos, but it |
| 11 | didn't.  That's okay.  No problem there.  But, anyway, it will |
| 12 | be docked.  And you're going to docket your August 28th letter. |
| 13 | MR. AUERBACH:  This afternoon, your Honor. |
| 14 | THE COURT:  And then, in addition, today, and I don't |
| 15 | even know what this is, Mr. Auerbach, you handed up some pages |
| 16 | with a yellow sticky note that says pages containing |
| 17 | redactions. |
| 18 | MR. AUERBACH:  Your Honor, again -- |
| 19 | THE COURT:  Explain, please. |
| 20 | MR. AUERBACH:  Again, in accordance with your |
| 21 | sentencing guidelines and your part rules, we were supposed to |
| 22 | bring to court today copies of those pages of the sentencing |
| 23 | memorandum that were redacted. |
| 24 | THE COURT:  This is unredacted. |
| 25 | MR. AUERBACH:  That's unredacted. |

20198sborgs

1          THE COURT:  The opposite of redacted.

2          MR. AUERBACH:  Yes, correct.

3          THE COURT:  So this is not redacted.  This is

4   unredacted.

5          MR. AUERBACH:  You're right.

6          THE COURT:  So that's why I'm confused.

7          MR. AUERBACH:  Those are the pages that contain the

8   yellow information that was redacted.

9          THE COURT:  From what was filed on the public docket.

10         MR. AUERBACH:  Yes.

11         THE COURT:  But you provided me already with a

12  complete unredacted courtesy copy, which is correct.  You did

13  that.

14         MR. AUERBACH:  I agree, your Honor.

15         THE COURT:  Thank you for doing that.

16         I'm handing this back.  I have enough things.

17         MR. AUERBACH:  Thank you, your Honor.

18         THE COURT:  Everything you've given me here you've

19  already given me, correct?

20         MR. AUERBACH:  Yes, your Honor.

21         THE COURT:  I'm handing it back.

22         Finally, I received and I reviewed the government's

23  sentencing memorandum dated August 23rd, 2019 and the attached

24  letters.

25         Okay.  Just trying to make a record here.


CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

20198sborgs

```
1            Has anything else been submitted that I failed to
2   mention just now?
3            MR. McMAHON:  Not from us, your Honor.
4            MR. AUERBACH:  No, your Honor.
5            THE COURT:  All right.
6            Mr. Auerbach, have you read the revised presentence
7   report and discussed it with your client?
8            MR. AUERBACH:  Yes, I have, your Honor.
9            THE COURT:  Mr. Borge, have you read the revised
10  presentence report?
11           THE DEFENDANT:  Yes, I have, your Honor.
12           THE COURT:  Have you discussed it with your attorney?
13           THE DEFENDANT:  Yes, I have, your Honor.
14           THE COURT:  You can have a seat.
15           If you're not actually speaking, please be seated.
16           Mr. McMahon, have you read the revised presentence
17  report?
18           MR. McMAHON:  Yes.  We both have.
19           THE COURT:  I'm just going to briefly summarize what
20  the presentence report says in terms of guidelines calculation,
21  which, of course, is the starting point for every sentence.
22           It says that the base offense level is seven under
23  Guidelines Section 2B1.1(a)(1).  There's a twenty-level upward
24  adjustment because the loss was approximately $21 million.
25  That's Section 2B1.1(b)(1)(K).  There's an additional two-level
```

20198sborgs

| 1 | upward adjustment because there were 10 or more victims. |

upward adjustment because there were 10 or more victims.

That's 2B1.1(b)(2)(A)(i).  I think that's the cite from the

guidelines.  Let me make sure that's right.  Hold on a second.

        (Pause)

        THE COURT:  Yes, that's right.

        There's an additional two-level upward adjustment

because the offense involved sophisticated means.  That's

Section 2B1.1(b)(10)(C).  There's a two-level upward adjustment

because the defendant abused a position of private trust.

That's Section 3B1.3.  That adds up to 33 levels.  There's a

three-level downward adjustment for acceptance of

responsibility under Section 3E1.1.  So when you do the

arithmetic, the final offense level is 30.  The defendant has

zero criminal history points such that he is in criminal

history category I, and, therefore, according to the

presentence report, the sentencing range is 97 to 121 months

imprisonment, the supervised release range is one to three

years and the fine range is $30,000 to $5 million.

        First of all, does the government have any objection

to any of the factual statements in the presentence report?

        MR. McMAHON:  No, we don't.

        THE COURT:  Secondly, does the defendant have any

objection to any of the factual statements in the presentence

report?

        MR. AUERBACH:  No, your Honor.

20198sborgs

1          THE COURT:  All right.  Well, that surprises me

2   because the presentence report reflects that you do have

3   objections.  But if you want to withdraw them, I'm fine with

4   that, because, otherwise, we have to address them one at a

5   time, which I'm happy to do.  But this is the time to do it,

6   not tomorrow or a year from now.  It's right now.

7          At pages 25 and 26 of the presentence report it

8   mentions seven objections from the defendant.  And I'm happy to

9   resolve them.  It's fine.  You made the objections to the

10  probation officer, but the probation officer is not the judge.

11  I'm the judge.  So I have to resolve them if they need to be

12  resolved.

13          MR. AUERBACH:  Your Honor, I believe that when I said

14  I didn't have any objections, it was because those pages are

15  contained within the report.

16          THE COURT:  So you do want me to address these

17  objections?  Which I'm going to do if that's what you want.

18  I'm not being critical of you.  It's just we have to do it now.

19  We can't do it tomorrow.

20          MR. AUERBACH:  I understand that, your Honor.

21          THE COURT:  Okay.

22          MR. AUERBACH:  If you would like to address each one,

23  that's fine.

24          THE COURT:  I have to address each one.  It's up to

25  you, though, if you're pressing any of those objections.

20198sborgs

1              MR. AUERBACH:  I would like them addressed, your

2        Honor.

3              THE COURT:  Okay.  Great.  Then that's what we're

4        going to do.  So you have them in front of you, right?

5              MR. AUERBACH:  I do, your Honor.

6              THE COURT:  So the first one is that you're objecting

7        to the reference in paragraph 11 of the PSR to eight straight

8        quarters, meaning quarters in which payroll taxes were not paid

9        over.  You say that's incorrect and it should be replaced with

10       seven reporting quarters.  And it says here that the government

11       says the loss amount stipulated to by the parties is covered by

12       the eight quarters referenced in the paragraph and is relevant

13       conduct to the offense.  As such, no changes were made.

14             So you're saying, even though the information -- the

15       information refers to seven quarters, correct?

16             MR. McMAHON:  It does, your Honor, yes.

17             THE COURT:  But you're saying relevant conduct, as

18       that term is defined under the guidelines -- and we're not

19       going to go into that right now because that would be another

20       several hours.  But we all understand what that means.

21             You're saying that the parties stipulated to the

22       loss.  Which you did.

23             MR. McMAHON:  We stipulated to the loss figure.  The

24       eighth quarter is relevant conduct.

25             THE COURT:  Right.

20198sborgs

1              Is that correct?

2              MR. AUERBACH:  Yes, your Honor.

3              THE COURT:  Well, then, to the extent you have an

4    objection, that objection is overruled.

5              Number two.  This is again on page 25.  It says

6    defense counsel objects to the language in the last sentence of

7    paragraph 12 and the first sentence of paragraph 47.

8              Those two sentences are a little bit different, but

9    the gist of them is, in paragraph 12, it says, "As a direct

10   result of these liabilities," meaning the College of New

11   Rochelle's liabilities as a result of the unpaid taxes -- I

12   think that's what that means -- "CNR," College of New Rochelle,

13   "will close at the end of the summer 2019 term."  That's in

14   paragraph 12.  And then in paragraph 47, the sentence you

15   object to is --

16             I apologize to everybody in the courtroom who is here

17   for a sentencing, but the federal sentencing law, especially

18   the guidelines, are extraordinarily complex and these are

19   issues that have to be dealt with, and they have to be dealt

20   with now.  So you're just going to have to be patient.

21             The first sentence in paragraph 47 is, "The

22   defendant's actions have directly led to the imminent closing

23   of the College of New Rochelle, causing thousands of students

24   to transfer to other colleges where some of their completed

25   credits towards their degrees may not be accepted."

20198sborgs

1          So the gist of it is -- and this is addressed at some

2     length in both parties' sentencing memoranda -- the

3     government's position is what Borge did and what he's pleaded

4     guilty to doing caused the closing of the college.

5          Which is now closed, right?

6          MR. McMAHON:  Yes.

7          THE COURT:  It's not imminent anymore.  It actually

8     happened.

9          MR. McMAHON:  Last week.

10          THE COURT:  And the defense position is, well, we

11     take full responsibility for these crimes, but it didn't lead

12     to the closing of the school.  And, obviously, the answer has

13     to be somewhere in the middle.  It must have had something to

14     do with the closing of the school.

15          I mean, your position is, no, no, no, you know, 20

16     plus millions of dollars has nothing to do with the closing of

17     the school.  Is that your position or is it more nuanced than

18     that?

19          MR. AUERBACH:  It's more nuanced and that, your

20     Honor.  It's exactly the way the Court just framed it.

21          THE COURT:  And, Mr. McMahon, it can't be correct to

22     say that this conduct caused the school to close.  How about

23     the fact that the school was in financial distress before he

24     committed this conduct?  That must be somehow relevant.  That's

25     why he did it.  Right?

20198sborgs

1          MR. McMAHON:  Yes.  It had financial problems up to

2     2014.  Those were well known to everyone.  But the defendant

3     then withheld critical information.

4          THE COURT:  I know what the case is about.  All I'm

5     saying is -- we love to have these kind of clean narratives,

6     but, in the real world, narratives are never clean.

7          The school had financial problems --

8          MR. McMAHON:  Yes.

9          THE COURT:  -- for some period of time.  Mr. Borge,

10     in his role as the guy who writes the checks, decided, you know

11     what?  Instead of writing checks for taxes which are due, I'm

12     going to pay expenses to keep the place open, because we have

13     problems, we have cash flow problems.

14          So it's got to be a combination of things.  It can't

15     just be the fact that he didn't write the checks.  He didn't

16     write the checks because of the financial problems.  It's a

17     combination.  I'm not saying you're wrong.  I'm not saying the

18     defendant is wrong.  It's somewhere in between.

19          MR. McMAHON:  We're not saying it's black and white.

20          THE COURT:  Well, it's kind of written in a

21     black-and-white way.

22          So, look, I'm going to address that in my remarks

23     after hearing from counsel.  It's plainly not black and white.

24     It's not all or nothing.  It's not binary.  It's not he

25     committed these crimes that caused the school to close.  That

20198sborgs

1    can't be right.  Common sense says otherwise.  But it also

2    can't be right he committed these crimes and it had nothing do

3    with the school closing.  And I think you conceded that point.

4              MR. AUERBACH:  Yes, your Honor.

5              THE COURT:  It's more nuanced than that.  And we're

6    going to address those nuances.

7              So I'm going to sort of defer on that.  I think I'll

8    address this important question -- this is an important issue

9    here for sentencing.  Rather than addressing it now, I think I

10   want to wait until I hear from everybody, and then I'll address

11   it later.  Okay?

12             Let's see.  What's next here?  Again, going back to

13   page 25, defense counsel contends that the fourth line of

14   paragraph 13 is incorrect as, during the period in question,

15   CNR -- and again, we can all agree that CNR is a reference to

16   College of New Rochelle -- did not have the sufficient cash

17   available to permit the defendant to transfer funds to ADP.

18   And the probation officer said, after referring with the

19   government, no changes have been made.

20             This is a little confusing to me.  Let me just look

21   at this again.  I'm not even sure exactly what the fourth line

22   means.  The fourth line in paragraph 13 starts in the middle of

23   a sentence.  I don't know if it's the fourth sentence or the

24   fourth line or what.

25             What exactly are you objecting to, Mr. Auerbach?

20198sborgs

1   This is your objection, so you need to tell me exactly --

2   exactly -- what your objection is.

3          MR. AUERBACH:  Your Honor, it's the sentence

4   beginning on the third line, in mid 2013.

5          THE COURT:  That entire sentence?

6          MR. AUERBACH:  That entire sentence.

7          The reference is to the word sufficient.  The college

8   didn't have sufficient funds.  So it wasn't Mr. Borge's failure

9   to transfer sufficient funds to ADP.  It was the college's

10  inability to have sufficient funds.

11         THE COURT:  Well, that's a nuance, right?

12         MR. AUERBACH:  Yes, your Honor.

13         THE COURT:  He didn't transfer the funds.  You're not

14  disputing that.

15         MR. AUERBACH:  No, your Honor.

16         THE COURT:  So the sentence reads:  "In mid 2013,"

17  which, again, is before the time frame of the information,

18  right, Mr. McMahon?

19         MR. McMAHON:  Yes.

20         THE COURT:  And it's relevant because it kind of all

21  sort of explains what happens later on.  At least that's your

22  view of the case, right?

23         MR. McMAHON:  That's right, yes.

24         THE COURT:  "In mid 2013, ADP," which is the outside

25  payroll processing company, "stopped handling CNR's tax returns

20198sborgs

1   and payments to taxing authorities as Borge had repeatedly

2   failed to transfer sufficient funds to ADP on a timely basis."

3           I think that's absolutely accurate.  The question of

4   why he did it, transfer the funds, is a different question, but

5   I think all that's saying is ADP said, look, we're out.  If you

6   don't give us the money, we're not going to perform these

7   services for you anymore.

8           Is that the gist of what happened here, Mr. McMahon?

9           MR. McMAHON:  Yes.  Exactly.

10           THE COURT:  Why he didn't give them the money is a

11   different question, but he didn't give them the money.

12   Correct, Mr. Auerbach?

13           MR. AUERBACH:  Yes, your Honor.

14           THE COURT:  And ADP said we're out.  You're on your

15   own.  You do your own tax returns and your own payments.  You

16   can't have it both ways.  We can't be on the hook for handling

17   payments and money that you don't give us.  You don't give it

18   to us, we're not going to do it anymore.  We're not going to

19   work for you anymore.

20           Is that what really happened here?

21           MR. AUERBACH:  Yes, your Honor.

22           The inference of the sentence is exactly the way the

23   Court has expressed it, that Mr. Borge didn't transfer

24   sufficient funds because there weren't sufficient funds

25   available to transfer.  So the inference is, by the way the

20198sborgs

1   sentence is written, that there was money available and

2   Mr. Borge failed to transfer it.  There wasn't.

3          THE COURT:  Let me stop you right there.  I don't

4   draw that inference.  So, having told you that I don't draw

5   that inference -- in other words, I'm not drawing the inference

6   that he didn't do it because he just didn't feel like doing it,

7   even though there was money to do it.  That's what you're

8   worried about, right?

9          MR. AUERBACH:  Yes, your Honor.

10          THE COURT:  I'm not drawing that inference.  I'm

11   drawing the inference that -- I'm not drawing any inference.

12   All I know is he didn't do it, period.  In that sense, the

13   sentence is accurate.  It's also not, strictly speaking, part

14   of the crime here.  The crime is not what happened in 2013.

15   The crime is what happened in 2014, '15 and '16.  Correct?

16          MR. AUERBACH:  Yes, your Honor.

17          I'll withdraw my objection, your Honor.

18          THE COURT:  Okay.  You withdraw the objection.  Fair

19   enough.  Let's move on.

20          The next one is on page 26, the next objection.  It

21   says, "Defense counsel objects that the underlying sentence in

22   paragraph 19 is factually incorrect and duplicative of the

23   statement made in paragraph 11."

24          Well, first of all, that's a reference to a heading.

25   It's not really a reference to a paragraph.  There's a

20198sborgs

paragraph 19 in the PSR.  Then there's a heading that

paragraphs 20 through 25 relate to.  Right?  The heading is the

underlying sentence.

Do you see what I'm talking about?

MR. AUERBACH:  I'm going there right now, your Honor.

THE COURT:  Paragraph 19 is paragraph 19.  It ends

with the word Borge.  Then it says, underlined, "The defendant

fails to pay the taxes or file payroll tax returns for eight

straight quarters from 2014 to 2016."  That's a heading.

MR. AUERBACH:  Your Honor, we'll withdraw that

objection.

THE COURT:  Thank you.

Let's see.  Next objection.  This is the next

objection.  "Defense counsel objects to the last sentence in

paragraph 39."  It's a reference to a sentence in the initial

disclosure of the presentence report which was then taken out

and moved in the final revised presentence report.

Remember, I don't see the initial disclosure.  That

never comes to me.  The only thing I see is what's final, the

revised report.  And what it says here is that you objected to

a sentence and that, after conferring with the government, the

Probation Office removed the sentence -- or moved it, I should

say, moved it from paragraph 39 to paragraph 42, this business

about 1466 overdrafts at one bank alone between September 2012

and September 2013.

20198sborgs

1      Does that resolve the matter or is there still

2   something more than I need to -- it's moved to 42.  And sure

3   enough, there it is.  It says in paragraph 42, "He directly

4   caused 1466 overdrafts at one bank alone from September 2012 to

5   September 2013."

6      I think that's correct.  Right?  I'm not sure there's

7   anything incorrect about that.  Is there?

8      MR. AUERBACH:  Your Honor, we have no information at

9   all whether it is correct or it isn't correct.  And the issue

10  as to how Mr. Borge was responsible for creating overdrafts

11  when there are a number of other people involved in the

12  accounting department, the word directly is what we objected

13  to.

14      THE COURT:  All right.  We're going to make this one

15  simple.  I don't need to resolve -- I understand your point.

16  You're saying, well, I don't really know whether that's true or

17  not.  And this directly reference is a way of characterizing it

18  that you don't think is correct, but -- so there is a dispute,

19  but I don't have to rule on the dispute because, as provided in

20  Rule 32(i) of the Federal Rules of Criminal Procedure, this is

21  not a matter that's going to affect sentencing one way or the

22  other.  I'm not sentencing him based on 1466 overdrafts,

23  period.  That's fine that it's in there.  It may be correct.

24  It may not be correct.  It's not going to affect sentencing at

25  all.

20198sborgs

1          So, having said that, is that acceptable to you,

2     Mr. Auerbach?

3          MR. AUERBACH:  Yes, your Honor.

4          THE COURT:  Okay.  There's a lot of -- not

5     extraneous.  I was about to say extraneous details.  That's not

6     correct.  There's a lot of extra detail, particularly in the

7     government's sentencing memorandum, which goes beyond what's in

8     the PSR.  Not sure why you would do that because all it does is

9     generate the opportunity for dispute and objections in an area

10    which, if you graphed it, you go from the left of the graph to

11    the right of the graph.  The really important stuff is on the

12    left and then, as you move along further and further to the

13    right, you get to the point where you're quibbling about things

14    that don't really matter that much to the sentence in this

15    case.  I'm not sure why you did it.  I'm not going to consider

16    any of that.  You've got three or four pages in there saying,

17    while not part of the case, we want to let the Court know about

18    all these other things.  Okay, you let me know, but I'm not

19    going to consider them at all because they're just minor things

20    that don't matter.

21          Let me just tell you what I'm talking about.  This is

22    similar to that.  On page 13 of the government's memorandum,

23    you say, "Additional conduct which was not expressly charged in

24    the information confirms that the defendant's intent was to

25    deceive others at CNR and that he acted alone in committing his

20198sborgs

crimes."  Now, you had already said that he deceived others and
he acted alone and you gave reasons for that, but then you gave
a bunch of other reasons from pages 13 through the first
paragraph on page 16.  I'm not going to consider those.

          I don't think any of that is in the PSR.  Am I right
about that?

          MR. McMAHON:  It's not, your Honor.

          It was offered in the sense of 404(b) as to the
defendant's intent.

          THE COURT:  Would you like us to try the case now,
too?

          This is not a trial.  We can have a trial if you
want, but I don't think that's really what you want.

          MR. McMAHON:  No, your Honor.

          THE COURT:  So it's not really appropriate for you to
say, okay, here's what we think are the key facts which are set
forth in the offense conduct section of the PSR, which are
numbered paragraphs, which gives the defendant an opportunity
to say I object to paragraph 13 or line 2 of paragraph 17 or
whatever the case may be, but here's some additional stuff as
well.  And if he objected to that, then we could adjourn
sentencing today, send all these people home, which I'm happy
to do if that's what you want me to do --

          MR. McMAHON:  No, your Honor.

          THE COURT:  -- and set aside a couple of days in the

20198sborgs

1   future in which we can try all these issues.  Do you want to do

2   that?

3               MR. McMAHON:  No.  There's no need for that.

4               THE COURT:  I didn't think you wanted to do that.

5               MR. McMAHON:  I understand you're not considering it

6   material to sentencing.  I only offered it on the issue of

7   intent.

8               THE COURT:  I'm not going to consider it.  There's

9   plenty of other stuff in here that bears on his intent and the

10  question of whether he concealed and so forth and so on.

11              But, in any event, we've sort of gotten sidetracked.

12  I think what you said, Mr. Auerbach, is that, in light of what

13  I just said -- namely, that I'm not going to consider and it

14  has no effect on sentencing, the language about the 1466

15  overdrafts -- that that satisfies you.

16              MR. AUERBACH:  Yes, your Honor.

17              THE COURT:  Okay.  Fair enough.

18              Moving on.  The next objection talks about how -- in

19  paragraph 49 of the PSR it says that the defendant will defer

20  to his plea allocution.  I'm not sure if you're objecting to

21  that.  You are deferring to his plea allocution as to

22  acceptance of responsibility, correct?

23              MR. AUERBACH:  Yes, your Honor.

24              What happened at the PSR interview was she asked

25  Mr. Borge to make a statement.

20198sborgs

1          THE COURT:  He doesn't have to make a statement.

2          MR. AUERBACH:  He wanted to.

3          THE COURT:  Oh.  Well, he can make a statement, of

4     course, if he wants to.

5          MR. AUERBACH:  And I politely said to the

6     representative that we would rely upon the plea allocution that

7     he made at the time.  And I provided her with a copy.  Her

8     reference as to advice of counsel and everything else was a

9     little bit on the dark side.  We did it as a courtesy.

10          THE COURT:  It's not really on the dark side.  It

11     happens routinely.  In any event, we got the plea allocution.

12     We know what he says there.  I know what he said there.

13          And, also, there's paragraph 50 where Mr. Borge does

14     make a statement, and you're not objecting to any of that.

15          MR. AUERBACH:  No.  Not at all, your Honor.

16          THE COURT:  So are you withdrawing --

17          MR. AUERBACH:  Yes, your Honor.

18          THE COURT:  To the extent you have an objection to

19     49, you're withdrawing that?

20          MR. AUERBACH:  Yes, your Honor.

21          THE COURT:  All right.  Excellent.

22          Finally, paragraphs -- this is the last objection.

23     It says, "Regarding paragraphs 118 and 119, defense counsel

24     states 'upon information and belief,' CNR soliciting a

25     'stalking-horse bitter,'" which, of course, I have no idea what

20198sborgs

1  that means, "for the college's real estate holdings in advance

2  of its anticipated August filing for Bankruptcy Court

3  protection, it is reasonably believed that, after payment of

4  priority creditors, all" -- the word says of, but I think it

5  means or -- "all or significantly all of the outstanding

6  federal tax obligations will be satisfied."

7          So, basically, in paragraphs 118 and 119, it talks

8  about restitution.  That's really what it talks about.  And

9  you're saying, well, he's not going to have to make restitution

10  because there's not going to be any loss at the end of the day

11  because all these tax obligations are going to be satisfied.

12          MR. AUERBACH:  Yes, your Honor.

13          THE COURT:  Have they been satisfied?

14          MR. AUERBACH:  No, they haven't, your Honor.

15          THE COURT:  Then to the extent you have an objection,

16  that's overruled.

17          MR. AUERBACH:  Thank you.

18          THE COURT:  And we'll address restitution in the

19  course of our sentencing proceeding today.

20          If they were satisfied, then you're right, then we

21  don't have to worry about restitution.  Obviously, the IRS is

22  not going to recover twice.  You get it once.  That's true with

23  any victim.  A victim gets the money back once, not twice.  But

24  they haven't gotten it back, correct?

25          MR. AUERBACH:  Your Honor, there have been some

20198sborgs

1   payments that have been made.

2             THE COURT:  Other than the payments that have been

3   made.  But a lot of it has not been paid.

4             MR. AUERBACH:  Correct, your Honor.  But I do have to

5   make one statement as to that specific issue.  If you would

6   like me to make it now, that's fine.  If you would like me to

7   make it later, that's fine, also.

8             THE COURT:  Go ahead.  We're on the subject, so go

9   ahead.

10            MR. AUERBACH:  To the extent that restitution is made

11  or ordered by Mr. Borge prior to the time the college wraps up

12  its affairs, Mr. Borge would obviously have a claim over

13  against the college, but his priority --

14            THE COURT:  Wait, wait.  He would have a claim over

15  against the college for what?

16            MR. AUERBACH:  For the payments that he made.

17            THE COURT:  Why would he have that?

18            MR. AUERBACH:  Because there's joint and several

19  liability on the obligation.

20            THE COURT:  Says who?  The college is not a defendant

21  in my case.

22            MR. AUERBACH:  Not in your case, your Honor, but the

23  college would have received the benefit from Mr. Borge making

24  the payment.

25            THE COURT:  Okay.  That's not a matter that's in

20198sborgs

1    front of me, though, is it?

2              MR. AUERBACH:  No, it's not, your Honor, but there is

3    an issue as to Mr. Borge losing priority in that event, and

4    that's a Bankruptcy Court issue.

5              THE COURT:  Well, he'll hash it out in Bankruptcy

6    Court, no doubt.

7              To the extent there's an objection here, the

8    objection is to the representation that a certain amount of

9    restitution shall be ordered, although, as I understand from

10   what the government submitted to me the other day, it's

11   actually a number that's different from that.  That happens

12   because either payments are made or -- well, anyway, it's

13   different.  It's lower.  Actually, the number that you

14   presented to me is lower by about a hundred thousand dollars.

15             MR. McMAHON:  The college made some payments.

16             THE COURT:  I'm sorry?

17             MR. McMAHON:  The college made some payments, yes.

18             THE COURT:  Which is why the actual number is lower.

19             MR. McMAHON:  Yes.

20             THE COURT:  Because nobody gets paid twice.  That's

21   not permitted.

22             MR. McMAHON:  And we're not seeking that.

23             THE COURT:  Right.

24             So to the extent there's an objection there, that

25   objection is overruled.  We'll address restitution in due

20198sborgs

1    course in more detail.

2            With the modifications that I've just made, the Court

3    adopts the factual statements in the presentence report as the

4    Court's own findings of fact for purposes of sentencing.

5            So, for example, if there's something you did not

6    object to, then I've accepted it as the relevant findings of

7    fact for purposes of sentencing.  Do you understand that,

8    Mr. Auerbach?

9            MR. AUERBACH:  Yes, I do, your Honor.

10           THE COURT:  Great.

11           Does the government object to the guidelines

12   calculation?

13           MR. McMAHON:  No, your Honor.

14           THE COURT:  Or anything else in the presentence

15   report?

16           MR. McMAHON:  No, your Honor.

17           THE COURT:  Does the defendant object to the

18   guidelines calculation or anything else in the presentence

19   report that we haven't already talked about?

20           MR. AUERBACH:  No, your Honor.

21           THE COURT:  All right.

22           Based on the parties' agreement as set forth in their

23   plea agreement as well as my review of the presentence report

24   and my own evaluation of the guidelines, I adopt the guidelines

25   calculation in the presentence report and conclude that the

20198sborgs

final offense level is 30 at criminal history category I, which
yields a sentencing range of 97 to 121 months imprisonment.

There's been no motion for any guidelines-based
departure from the applicable range, nor am I aware of any
basis for a departure.

And, again, so we're clear, that doesn't mean that
the defendant is not entitled to make an argument for a
downward variance; in other words, for a sentence which is
below the guideline range.  You certainly can do that.  And you
and the government, both sides, have agreed to that in the plea
agreement, correct?

MR. McMAHON:  Yes.

THE COURT:  But that's different from a
guidelines-based departure, and there's been no motion for any
guidelines-based departure.

Am I right about that, Mr. McMahon?

MR. McMAHON:  You are, yes.

THE COURT:  And Mr. Auerbach?

MR. AUERBACH:  Yes, your Honor.

THE COURT:  All right.  Finally, we get to the main
event.

Does the government wish to be heard on sentencing?

Now, Mr. McMahon, you told me in your sentencing
memorandum that there's a representative of the college that
would like to be heard today and let's address that first.

20198sborgs

```
1    Just trying to remember.  I'm sorry.  I apologize.  I don't
2    remember her name.  You gave it to me, but --
3                MR. McMAHON:  Yes.  Gwen Adolph.
4                THE COURT:  And she's the Chair of the Board of
5    Directors, or Board of Trustees?
6                MR. McMAHON:  She was the Chair of the Board of
7    Trustees at the relevant time.
8                THE COURT:  That's Ms. Adolph.
9                MR. McMAHON:  Yes.
10               THE COURT:  Okay.
11               Do you have any objection from the Court hearing
12   directly from Ms. Adolph on behalf of the college?
13               MR. AUERBACH:  No, your Honor.
14               THE COURT:  All right.  My suggestion would be that I
15   her hear from her first and then you make whatever arguments
16   you want to make thereafter.
17               MR. McMAHON:  Yes.  I would prefer that, yes.
18               THE COURT:  Ms. Adolph, are you here?
19               MS. ADOLPH:  I am.
20               THE COURT:  Can you come up, please.
21               MS. ADOLPH:  Yes.
22               THE COURT:  My deputy is going to give you a
23   microphone.  You can come up and stand next to the government
24   table.  Stay right there, ma'am.  And then just tell me
25   anything you want to tell me.  But just speak into the
```

20198sborgs

1    microphone.

2              MS. ADOLPH:  Thank you, your Honor.

3              THE COURT:  Sure.

4              MS. ADOLPH:  So I'll start by saying that today is

5    not an easy day for anyone in this courtroom, and I appreciate

6    the opportunity to share the College's perspective.

7              I am the former Chair of the Board of the College of

8    New Rochelle, and I was honored to serve the College because of

9    its long tradition of offering top-quality education to those

10   who traditionally were denied access, whether it was young

11   women of Italian and Irish decent in its early years or men and

12   women of color in recent years.

13             In my very first board meeting as Chair almost three

14   years ago today, I had the onerous task of giving the Board

15   inconceivable news.  The College had approximately $20 million

16   in unrecorded payroll tax liability because Keith Borge, the

17   former Controller, failed to pay payroll taxes for eight

18   quarters.  Two years.

19             The Board had millions more in unrecorded debt

20   because Mr. Borge created and maintained false financial

21   records.  This was discovered not because Mr. Borge came

22   forward with the truth, but because, when he was hired, he was

23   replaced by another controller who uncovered the truth.

24             This catastrophic news came on the heels of very

25   positive news.  The College's first co-ed class -- what would

20198sborgs

have been the Class of 2020 -- was the largest freshman class
in 30 years.  The future seemed bright, but it darkened
quickly.

The news and impact of Mr. Borge's actions was
devastating, but, as devastating as it has been for me, the
personal impact on me paled in comparison to that of others.

I am not an Ursuline like several of our alumnae
trustees.  They were the keepers of the legacy of a
115-year-old institution founded by the Ursuline Order as the
first college for women in the State of New York.  They
personify the Ursuline motto, "Serviam," which means "I will
serve."  They have given their all to CNR and they are
devastated.

I am not an alumna like the current Board Chair and
the other impressive alumna trustees who have worked tirelessly
to keep the College open, hour after hour, or like countless
other alumnae and alumni who loved and supported their alma
mater until the end.  They are devastated.

I was neither faculty, staff, nor an administrator,
who loved our students and who were loved by them.  I did not
grow up attending Mass in the chapel like many, nor did I marry
there like others.  CNR wasn't just a school; it was an
integral part of the lives of many, and they, too, are
devastated.

And most of all, I was not a parent of a student nor

20198sborgs

1      a student like those who wrote compelling letters to the Court

2      or like many intelligent and hopeful CNR students, most of whom

3      were the first in their families to go to college, who had

4      their CNR dreams extinguished too soon.  They are beyond

5      devastated.

6              Instead, I am the person who was tasked with leading

7      the effort to pick up the pieces after Mr. Borge's actions were

8      revealed.  I was the person responsible for leading the Board

9      and community through a long, frustrating, stressful,

10     heartbreaking fight to keep the College open -- the right way,

11     the hard way, the honest way.

12             I am here today for one reason.  The law was broken

13     and many lives have been shattered, including Mr. Borge's and

14     his family's.  We are all here today because of a deception

15     that was purposeful, long-lasting, broad-reaching and, most

16     tragically, unnecessary.

17             Keith Borge's coverup occurred over several years and

18     cost the College critical time and prescious resources that

19     could have been used to sustain it.

20             When the financial crisis was discovered, a special

21     committee of the Board was formed.  We immediately retained

22     outside counsel to help the College investigate the crisis.

23     This was a significant cost to the College.

24             The special committee met daily for months.  I think

25     we stopped for holidays.

20198sborgs

1          The independent investigation came to the same

2     conclusions that are described in the government's charges.

3     Keith Borge failed to pay $20 million in payroll taxes,

4     maintained false financial records, lied to the Board and

5     others, and hid the College's true financial condition.

6          The investigators also found that, even after he

7     retired, Mr. Borge continued to cover up his actions.  He lied

8     to the new Controller and the then Vice President of Finance,

9     saying all taxes were paid and the tax returns were stored in

10    his office.  This simply was not true.  He then sent the new

11    Controller on a wild goose chase searching for records that did

12    not exist while he knew the truth.

13         Mr. Borge also lied to investigators repeatedly

14    during his interview, stating that he had paid taxes when he

15    knew he had not.  The deception was crippling and, sadly, it

16    was avoidable.

17         After the conclusion of the College's independent

18    investigation, an executive committee of the Board continued to

19    meet weekly and talked almost daily for nearly three years in

20    an attempt to sustain the College and to protect our students.

21    The full Board met multiple times over 36 months.  We left no

22    possible solution unpursued and we even pursued impossible

23    ones.

24         Mr. Borge's actions cost us critical resources and,

25    by doing so, it took away many options the Board might have had

20198sborgs

1    to keep the College open.  For example:

2              We spent millions of dollars servicing a debt that

3    could have been avoided.

4              We spent significant money on forensic accountants

5    and attorneys who had to unravel the extent of Mr. Borge's

6    fraud.

7              We spent significant time, money and human resources

8    working with counsel and a restructuring officer to address the

9    many challenges that arose as a result of Mr. Borge's actions.

10             We spent money, time and human resources trying to

11   overcome negative press when we could have and should have been

12   using those precious resources to recruit new students.

13             Our donor outreach could have been much more

14   effective had we been given accurate information to share with

15   others sooner.  Many were simply unwilling to contribute to

16   what appeared to be an insurmountable debt, and many donors

17   refused to donate until someone was found to be criminally

18   responsible.

19             Discussions with potential partners ultimately failed

20   because the College's debt was too high.  One potential

21   partner, with whom we had several conversations, backed out at

22   the very end because CNR's debt would have negatively impacted

23   its credit rating.

24             Financial experts have told us that the College could

25   have been sustainable but for the tremendous cost of servicing

20198sborgs

1  the debt incurred by Mr. Borge's failure to pay taxes and his

2  other mismanagement.

3         If the Board had been given a true and accurate

4  picture of the College's finances sooner, it could have acted

5  sooner to fundraise, negotiate deals with creditors, pursue

6  partnerships and sell assets.  It could have avoided tremendous

7  fees for investigations, counsel and debt service.  And while

8  we can calculate the money lost, we will never be able to

9  calculate the cost of the human toil.

10         Time and again, doors were closed and options cut

11  off.  This spring, three miraculous years later, the College

12  finally ran out of time and options.  The very last graduates

13  of the College of New Rochelle received their degrees this

14  month.

15         Keith Borge broke the law.  Whether it was for

16  misplaced nobility, self-preservation or just sheer deception,

17  the net result is the same.  The College of New Rochelle is

18  closed and lives have been shattered, and no sentence can

19  change that.

20         Thank you.

21         THE COURT:  Thank you very much, ma'am.

22         Okay.  I take it that's the only victim that wishes

23  to speak today.

24         MR. McMAHON:  Yes.

25         THE COURT:  I mean, I reviewed many, many letters

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

20198sborgs

which are in the nature of victim impact statements, but

there's no one else that wishes to speak.

        MR. McMAHON:  Nobody else.

        THE COURT:  Okay.

        Mr. McMahon, do you wish to be heard?

        MR. McMAHON:  I do, your Honor.

        Judge, we're asking for a sentence of incarceration

today.  We recognize that there was no personal gain here, and

that's why we have suggested that your Honor actually vary

below the otherwise applicable guideline range, because this is

an unusual case, but we still think that these two offenses

here are still very serious and do warrant incarceration for

three reasons.

        The first reason is and what really stands out most

about these offenses is the impact that it has had on the

college.  You've read the sentencing memos.  You've heard from

Ms. Adolph about that.  And very simply, we do contend that

Mr. Borge withheld critical information from the Board at a

critical time and did it for so long that, when they finally

discovered the truth in 2016, it was too late for them to do

anything.  We know they would have taken action had they known

in 2014 about what was going on.

        All Mr. Borge had to do was to say to them, look, I

don't have enough money to pay everything, we need to do

something here.  All he had to do at any point in two years was

20198sborgs

1  to say, look, we have a growing tax liability here, we have to

2  do something about that.  That's all information that he and he

3  alone held, and he withheld it from CNR's management, thus

4  depriving them of the opportunity, and we contend that's what

5  led to the closing of this institution.

6          You've heard from Ms. Adolph about the unique nature

7  of this institution and how it basically provided hope and

8  opportunity to, in 115 years, I understand, over 50,000 people,

9  and the loss of that institution is tragic, and that's an

10  impact that I think is fair for your Honor to consider in

11  sentencing because it basically was a result that was

12  foreseeable to the defendant and only to the defendant because

13  he is the only one that had that information.

14          Secondly, that impact is far more serious than what

15  we see in pretty much any fraud case here that I've been

16  familiar with, or any tax case here.  You know, in a fraud

17  case, we have victims.  Some of them, they've lost everything

18  they have.  I've often wondered, with those people, how they

19  get by and how they live, and I've never followed up to find

20  out.  But your Honor's heard the stories and so have I.  That's

21  a devastating impact.  But, here, we have the loss of a whole

22  institution that was such a positive force in our community for

23  so many years and helped so many people over so many years, and

24  that's just tragic.

25          Despite all of that, your Honor has read the

20198sborgs

presentence report, you've read the defendant's sentencing memo
and his letter, as well, and at least it appears to me, I would
submit, that he hasn't really fully acknowledged the impact of
what he's done.  I've gone through all of that in the
sentencing memo.  He really even hasn't acknowledged almost
that he hasn't done anything wrong.  Instead, he paints himself
as a hero for keeping the college open for two more years so
that more people could graduate, and that's good for those
people, but it's not good for all the people who won't have the
opportunity to go to CNR in the future.  And I contend that, in
some sense, by calling himself a scapegoat and saying he's a
tragic mascot, he's really just continuing the fraud right up
until sentencing day.

        The third reason, and I covered this in the
sentencing memo, is general deterrence; general deterrence
first as an employer who, obviously, holds the withheld taxes
in trust, there's a real need for general deterrence there, and
there's also a need for general deterrence with respect to
municipal bond issuers because they do occupy a special
position as a securities issuer for the reasons that I stated
in my sentencing memo.

        So those are the three reasons why we think that
incarceration is warranted here.

        Thank you.

        THE COURT:  All right.  Let me just ask you a couple

20198sborgs

1    of questions which gets to some of these restitution issues,

2    but you're on your feet right now, so maybe we can talk about

3    it now.

4            I know that the parties stipulated that the total

5    loss figure for the payroll tax charge, including relevant

6    conduct -- including relevant conduct -- was $20,240,000 and

7    change.  That's in the plea agreement.

8            MR. McMAHON:  Yes.

9            THE COURT:  But the indictment with respect to the

10   federal payroll tax charge alleges approximately $13.2 million

11   in unpaid payroll taxes.

12           MR. McMAHON:  Yes.

13           THE COURT:  So that's $7 million less than the total

14   figure, and I'm just trying to figure out -- just give me a

15   little more basis here.  Explain to me how we go from 14 to 20.

16   That's a pretty big jump.

17           MR. McMAHON:  Yes.  Two reasons.

18           THE COURT:  That's almost -- well, it's more than a

19   50 percent increase over the amount alleged in the indictment.

20           MR. McMAHON:  First of all, in the information, it

21   charges only seven quarters.

22           THE COURT:  The information.  I'm sorry.  I said

23   indictment.  I meant information.

24           MR. McMAHON:  The information charges seven quarters.

25   It does not charge the last quarter because the defendant

20198sborgs

1        retired on the last day of the last quarter.  However, we

2        contend the loss from that last quarter, the eighth quarter, is

3        relevant conduct because the defendant was required to make

4        deposits with the IRS once a week.  Essentially, every time

5        they had a payroll, he had to make a deposit.

6                    THE COURT:  So what was the approximate amount of

7        that last quarter?  Approximately.  Is it roughly the same as

8        the other quarters?

9                    MR. McMAHON:  It's roughly the same as the others.

10                   So that gets you up, I believe, to about 15 million.

11       The other 5 million is the withheld or the failure to pay over

12       the withheld state payroll taxes.

13                   THE COURT:  Okay.  And there's plenty of case law out

14       there.  Although, when the guidelines were new and the tax

15       guidelines in particular were new, there was a lot of dispute

16       about this, but I think it's long settled that, even though the

17       crime is federal taxes, in this case, payroll taxes not being

18       paid, if part and parcel of that pattern of conduct includes

19       the failure to pay or, in some cases, the evading of state

20       income taxes, well, then those can be included in relevant

21       conduct.

22                   MR. McMAHON:  Yes.

23                   THE COURT:  So that's what you're talking about?

24                   MR. McMAHON:  That's what I'm talking about.

25                   THE COURT:  And that's been agreed to, right?

20198sborgs

1           MR. McMAHON:  Yes.

2           THE COURT:  Right, Mr. Auerbach?

3           MR. AUERBACH:  Yes, your Honor.

4           THE COURT:  I just wasn't sure exactly how it got

5    from 13 to 20.2 million.  So that's two pieces.  One, one extra

6    quarter and, two, the state taxes.

7           MR. McMAHON:  Yes.

8           THE COURT:  All right.  You answered my question.

9           Next question.  In the restitution order that you

10   proposed, you said that the restitution for the tax count --

11   now, we're only talking about the federal tax count at this

12   point -- is roughly $11 million.  Now, that's less than 13.

13   It's also less than 15.  Is that because it just reflects

14   payments that have been made since then --

15          MR. McMAHON:  Yes.

16          THE COURT:  -- since those quarters were not paid?

17          MR. McMAHON:  The College entered into a payment

18   plane with the IRS and made some payments and then, after that,

19   it was unable to make payments, so it stopped.  So the

20   resulting current balance is the figure that's on page 1 of the

21   proposed order.

22          THE COURT:  Okay.

23          Next question.  This is not spelled out anywhere in

24   anybody's papers, although I think I know the answer to it, but

25   why is the defendant responsible for paying restitution --

20198sborgs

1    well, what is the statutory basis for the restitution

2    obligation to, A, the IRS and, B, New York State?  The New York

3    State one is harder than the IRS one.

4           I'm going to answer my own question, but it's not in

5    here anywhere and I just want to confirm this on the record.  I

6    think it's in -- it's not in Section 3663; rather, it's in

7    Section 3663A(a)(1) as well as (c)(1)(B).  That's what my

8    research has shown.

9           MR. McMAHON:  Yes.  It's in 3663A and then also --

10          THE COURT:  Just so the record is clear, for some

11   reason -- God bless Congress -- there's a 3663, which has a

12   subdivision (a), but that's not what we're talking about.

13   We're talking about 3663A, which is not a subdivision.  It's

14   just 3663A.  And then there's a bunch of subdivisions.

15          MR. McMAHON:  Yes.  And I actually prefer to go with

16   the 3663 rather than the 3663A.  3663A refers to mandatory

17   restitution for certain crimes in Title 18.  Here, we have a

18   Title 15 crime and a Title 26 crime.  So it really is 3663,

19   which applies to all federal offenses.  And, here, we have --

20          THE COURT:  See, I'm not sure.  I thought it was the

21   reverse of what you just said.  I thought that 3663, the first

22   of those two statutes, refers to restitution for offenses under

23   this Title as well as under the Controlled Substances Act,

24   which neither of those apply here, or certain sections in Title

25   49, which also does not apply here, whereas, 3663A is somewhat

20198sborgs

1   different.

2               MR. McMAHON:  Your Honor, you are right.

3               THE COURT:  Oh.

4               MR. McMAHON:  I reversed it.

5               THE COURT:  For once.

6               MR. McMAHON:  Yes.  I concede.

7               But even if I went with 3663(a) --

8               THE COURT:  Capital A.

9               MR. McMAHON:  Small A.

10              THE COURT:  Oh, small A.

11              MR. McMAHON:  Well, 3663 --

12              THE COURT:  I know.  Chris, sorry.  It's not our

13  fault, Chris.  It's not.

14              3663A, meaning no parentheses, just 3663A, that's one

15  statute.

16              MR. McMAHON:  Yes.

17              THE COURT:  There is a different statute that's

18  3663(a).  Right?

19              MR. McMAHON:  Yes.

20              THE COURT:  So try to be explicit for the record.

21              MR. McMAHON:  Maybe I can simplify.

22              Both of those statutes provide that if there is an

23  agreement in a plea agreement, the Court may enforce it.

24              THE COURT:  Well, the plea agreement doesn't specify

25  the amount of money, though, does it?

20198sborgs

1          MR. McMAHON:  It does not specify the amount of

2     money.  It does say that the Court can determine the amount of

3     money.  But it does say that restitution shall be paid and made

4     a condition of probation or supervised release.

5          THE COURT:  It definitely says that.

6          Do you agree with that, Mr. Auerbach?

7          MR. AUERBACH:  As the Court may order, your Honor.

8          THE COURT:  Right.  So now the question is what am I

9     going to order.

10          I think the appropriate -- I think -- and this stuff

11    is dense, but I think the appropriate subsection is 3663A(a)(1)

12    and (c)(1)(B), because C(1)(B) in particular says, "This

13    section shall apply in all sentencing proceedings for

14    convictions of or plea agreements relating to charges for any

15    offense (b) in which an identifiable victim or victims has

16    suffered a physical injury or pecuniary loss."

17          The key language there is any offense as opposed to

18    offenses under this Title, which is what 3663 -- not 3663A, but

19    3663, period, applies to.

20          MR. McMAHON:  Right.

21          THE COURT:  There is a difference.  I think that's

22    why Congress passed -- well, I don't really know why they

23    passed 3663A.  Anyway, it's different.  Subtly, but it's

24    different.  Right?

25          MR. McMAHON:  Yes.

20198sborgs

1          THE COURT:  I understand it's in the plea agreement,

2    but, again, I want to make sure the record is complete here.

3    I've had some experience, I'm sure you have, as well, with

4    defendants who get sentenced for whatever and then decide later

5    on they want another bite at the apple either in terms of an

6    appeal or in terms of a 2255 motion, and I'm really trying to

7    avoid that here.  I want to make sure we're absolutely clear as

8    to where this obligation arises.  And I think I've stated on

9    the record where I think this obligation arises from

10   irrespective of the plea agreement.  Do you agree with me on

11   that?

12          MR. McMAHON:  Yes.

13          THE COURT:  Do you agree with me on that,

14   Mr. Auerbach?

15          MR. AUERBACH:  Yes, your Honor.

16          THE COURT:  All right.  Great.

17          Now, the next question is -- or maybe I already

18   answered this question -- why would New York State be entitled

19   to -- yes, no, this is the next question.  We talked about the

20   IRS and which statute is the relevant statute.  What about New

21   York State?  Why is New York State entitled to restitution?

22   And the number you've provided is roughly 1.6 million.

23          Now, I know you said that's relevant conduct.  Now,

24   relevant conduct is a sentencing guidelines concept.  It's not

25   a restitution concept.  Restitution is different from relevant

20198sborgs

1     conduct.  You agree with me on that?

2                    MR. McMAHON:  That's true, yes.

3                    THE COURT:  I will note for the record so that we can

4     kind of cut through this that Section 3663A(a)(2) says, in

5     defining what a victim is, a person directly or proximally

6     harmed as a result of the commission of an offense for which

7     restitution may be ordered, including in the case of an offense

8     that involves a pattern of criminal activity -- and I'm

9     paraphrasing a little bit -- any person harmed by the

10    defendant's criminal conduct in the course of the pattern.

11                   So that would, to me, seem to incorporate sort of a

12    relevant conduct concept into restitution.  So it's not just

13    the victim of the actual offense, which, here, the actual

14    offense is federal tax fraud -- or not fraud, but failure to

15    pay federal taxes.  That's not New York State.  That's federal.

16    That's the actual crime.  But do you agree with me that the

17    provision I just referenced on its face includes a victim who

18    is harmed by the pattern, not just the victim who is directly

19    harmed by the actual crime that was committed?  Is that clear

20    enough?

21                   MR. McMAHON:  That is clear, and I agree with it.

22                   THE COURT:  What about you, Mr. Auerbach?

23                   That's the question about New York State now.  We're

24    not talking about the Feds.

25                   MR. AUERBACH:  I understand the provision that the

20198sborgs

1    Court has read, and I don't have a problem with the Court's

2    interpretation of that.

3              THE COURT:  I didn't write it.  I mean, I'm just

4    reading the statute.  I'm just trying to figure out the

5    statutory basis for this.

6              Now, of course, there's always a backup, which is the

7    parties can agree in a plea agreement to anything.  It doesn't

8    even have to be provided for in the statute.  You could have

9    agreed to pay me restitution if you wanted to.  That would

10   create a bit of a conflict, I suppose, but the point is you can

11   agree to a lot of things that aren't necessarily incorporated

12   into the statute.  Here, you did agree to restitution with the

13   language that was cited earlier.  It's just that the dollar

14   amounts are not specified and it doesn't specify that

15   restitution would be paid to New York State, which is why I

16   thought it would be important to discuss this a little bit

17   today.  Or not a little bit.  To discuss this today.

18             So are we all in agreement on this, that the

19   statute -- forget about the plea agreement for the moment --

20   the statute provides for restitution to the IRS if, in fact --

21   not the IRS -- to New York State tax authorities if New York

22   State is a victim harmed as a result of the pattern of criminal

23   conduct that the defendant's been convicted of?

24             MR. AUERBACH:  From a statutory basis, your Honor, I

25   agree.  The problem is we have no information to determine

20198sborgs

| | |
|---|---|
| 1 | whether or not New York is still owed any money.  We know that |
| 2 | there have been payments made to the Internal Revenue Service. |
| 3 | We've received notification of those payments.  But we have no |
| 4 | idea what payments, if any, have been made or what payments |
| 5 | will be made to New York.  And I understand the Court has |
| 6 | already said there won't be double dipping. |
| 7 | THE COURT:  There won't be double dipping.  And I'm |
| 8 | not going to reduce his obligation because of something that |
| 9 | might be paid in the future.  I'm not doing that. |
| 10 | MR. AUERBACH:  I agree with that, your Honor.  I |
| 11 | think that the operative word is might. |
| 12 | THE COURT:  Might is a very important word.  I mean, |
| 13 | the College is in bankruptcy now, right?  Or is it? |
| 14 | MR. McMAHON:  It is about to be. |
| 15 | THE COURT:  About to be.  And when that happens, |
| 16 | there's a whole different set of procedures that come into |
| 17 | place.  And everyone hopes, certainly the College hopes, |
| 18 | certainly the IRS hopes, the state tax authorities and |
| 19 | Mr. Borge, they all hope that this property and the buildings, |
| 20 | et cetera, are worth enough money and that there are people out |
| 21 | there willing to buy that in the bankruptcy proceedings such |
| 22 | that the victims in this case will ultimately get paid. |
| 23 | Everybody hopes that's going to happen.  But we don't know |
| 24 | what's going to happen.  We don't know.  Unless you're going to |
| 25 | buy it.  I mean, do you know someone who has their checkbook |

20198sborgs

1  out and they're ready to write a check?

2           MR. AUERBACH:  No.

3           THE COURT:  I don't think so.

4           So what are you saying?  You don't object to the

5  concept of restitution to the State of New York.  It's just

6  that you don't know what the backup is for that particular

7  number.

8           MR. AUERBACH:  No, your Honor.  I mean, we're at a

9  different threshold.  The statutory scheme may be the statutory

10  scheme as interpreted by the Court.  Our position, we don't

11  believe that there should be restitution at all for a number of

12  reasons that we've spelled out in your sentencing memorandum.

13  Suffice it to say, there's been no personal gain.

14           THE COURT:  Restitution has nothing to do with

15  personal gain, so if that's one of your arguments, that's

16  rejected.

17           MR. AUERBACH:  I understand that, your Honor.

18           THE COURT:  If you, for whatever reason, and the

19  motivation is, obviously, highly relevant here -- let's just

20  say hypothetically in a different case somebody does something

21  that hurts somebody else for no possible benefit to himself.

22  Maybe that's the case here.  Maybe it isn't.  But let's just do

23  it as a hypothetical right now.  I engage in criminal conduct

24  that hurts somebody else.  I get no benefit from that at all.

25  That's unusual.  Most criminal cases involve a certain --

20198sborgs

1    because human beings are people that act out of self-interest

2    more than anything else.  So usually, when you hurt somebody

3    else, you're doing it to help yourself.  The two kind of go

4    together.  But let's just assume for a moment that it has

5    nothing to do with you, it's just hurtful to someone else.

6    You're still obligated to compensate that somebody else for the

7    hurt that your conduct caused, even though it didn't benefit

8    you yourself.  Surely you agree with that concept.

9              MR. AUERBACH:  In the absolute values that you put

10   forward, I agree, your Honor, but the factual setting that we

11   have here is not as cut and dried as the hypothetical that the

12   Court just placed forward.

13             The situation we have here is that the ship was

14   sinking.  Mr. Borge did what he did in order to try to save the

15   ship.  And the ship sank.  Mr. Borge did not cause, in and of

16   his actions alone, the ship to sink.

17             THE COURT:  The key word is alone.  I would agree

18   with that.  I said that earlier.  I don't think it's alone

19   because it's in the context of a ship that was taking on water,

20   at least.

21             But, having said that, the bottom line is he didn't

22   pay -- he was the responsible person.  He knew he was the

23   responsible person.  He willfully, deliberately and

24   intentionally did not pay monies that he knew he was obligated

25   to pay and, as a result of that, A, he's been convicted of a

20198sborgs

1   crime and, B, the Feds and the State were hurt.  Therefore,

2   restitution is appropriate in my view.  So to the extent you're

3   saying it's not appropriate, that objection is rejected.

4           There's still a question, which is how do we get to

5   that number, you know, the actual number, which is to the

6   penny.  It's not exactly a wild guess.  It's $1,617,694.49 for

7   the State.  And I think you said before we don't know where

8   they got that number.  Where does that come from?  That's a

9   reasonable objection.

10          Where does it come from?

11          MR. McMAHON:  Well, your Honor, it comes straight

12   from New York State.  We consulted with them, and that's the

13   balance that they gave on CNR's account.  I would note, also,

14   that that figure appears on paragraph 46 of the PSR, which your

15   Honor has already adopted.

16          THE COURT:  Well, that's a pretty good point, the

17   second point.  That, to me, resolves the question.

18          The point is you didn't make up the number.  You got

19   it from the State.

20          MR. McMAHON:  Yes.

21          THE COURT:  You got it from the State.  You told the

22   probation officer about it.  The probation officer put it in

23   the report.  There's no objection.  And I've adopted the facts

24   as modified, meaning, I've certainly adopted the relevant facts

25   here, those facts that are in the PSR, to which there was no

20198sborgs

1    objection.  There is no objection to paragraph 46.  That's the

2    end of it unless you want to withdraw what you said earlier --

3            MR. AUERBACH:  No, your Honor, no.

4            THE COURT:  -- and object to something that you

5    previously said you did not object to.

6            MR. AUERBACH:  No, because it will all come out in

7    the wash.

8            THE COURT:  All right.  Well, then, to the extent you

9    have -- I'm satisfied as to where those numbers come from.

10   That's really what -- I'm satisfied that there's a statutory

11   basis.  We talked about it at great length.  And I'm satisfied

12   that they come from a place which has been reflected in the

13   report to which there's no objection.

14           All right.  Let's move on.

15           Those were the only additional questions I had for

16   you, Mr. McMahon.  Thank you very much.

17           Mr. Auerbach, do you wish to be heard?

18           Now, keep in mind, I've read every single line of

19   every single page of everything that you've submitted.  Having

20   said that, you can say anything you want at this time.

21           MR. AUERBACH:  Thank you, your Honor.

22           Ms. Adolph said there are no winners here today.

23   Everybody's a loser.  Mr. Borge, the College, the students, the

24   faculty, the staff, the U.S. Attorney's Office, the United

25   States Government, this Court, New York State.

20198sborgs

1          The Court is aware that, dating back as far as 2010,

2    the College has had financial problems.  In 2013, the President

3    of the College was made aware of the problem with the

4    withholding taxes, and that's set forth I believe in paragraphs

5    15 through 19 of the PSR.

6          THE COURT:  Presentence report.

7          MR. AUERBACH:  Yes, the presentence report.

8          It was glaring at the time that I read the initial

9    draft and followed through with the final that, on one hand,

10   they're saying we knew nothing about it, we had no information,

11   this was all new news, but three years prior to Mr. Borge's

12   retirement, he was demoted for failure to file and failure to

13   pay, exactly what he's charged with right now, because the

14   College didn't have the money then.

15         THE COURT:  No, no.  Not exactly.  Similar.  But what

16   he's charged with now is not what was not paid in 2013.

17         MR. AUERBACH:  No, no.

18         THE COURT:  So you can't say it's exactly the same.

19   It's not.  That matter came up.  It was discussed openly and it

20   was resolved.  What the folks from the College are saying and

21   what the government is saying is that's not what happened with

22   the relevant time frame of the indictment, which is the 2014 to

23   2016 time frame.  That happened in the past.  It didn't happen

24   with the relevant charges in this case.

25         I think that's what you're saying, Mr. McMahon.

20198sborgs

1    Correct?

2                MR. McMAHON:  Yes, your Honor.

3                MR. AUERBACH:  Your Honor, the information from 2014

4    to 2016 was similar in nature in the underlying act of what

5    happened between 2012 and 2013.  The College did not have the

6    money in 2012, 2013 and ultimately got the money in 2015 to

7    satisfy those obligations.  It's all in the PSR.  And the Court

8    is aware of that.  However, for the College to say we didn't

9    know anything about it is much akin to a wife saying, oh, my

10   husband's cheating on me; oh, I didn't remember that he cheated

11   on me before.

12               THE COURT:  That's not even remotely close.  You made

13   the argument.  I said you could say anything you want --

14               MR. AUERBACH:  Thank you.

15               THE COURT:  -- but that's not a very effective

16   argument to be brutally honest.

17               MR. AUERBACH:  It may not be, your Honor, but that's

18   from the heart and that's the problem with this case.

19               The role that Mr. Borge took in connection with his

20   actions and his guilty plea with the two charges set forth in

21   the information has been acknowledged.  Mr. Borge is guilty of

22   it.  He admitted he is guilty.  He's expressed his emotionality

23   about the guilty plea both in the private letter to the Court

24   as well as in his allocution statement.

25               If you look at the victims' letters and at the

20198sborgs

1   character reference letters, specifically from Mark Maffucci,

2   who is a retired Senior U.S. Probation Service officer --

3           THE COURT:  I know Mr. Maffucci quite well.

4           MR. AUERBACH:  And his recommendation was probation.

5           James Coyne, who was a captain commanding officer of

6   the Criminal Investigation Unit for the New Rochelle Police

7   Department pled for leniency.

8           Mr. Borge hasn't done anything wrong his entire life

9   other than for what we're here for today.  He's caring for his

10  mother-in-law and her sister.  He's a father to two children

11  that he's raised in a nuclear family.  He was a supporter to

12  the point of bleeding for the College.

13          Mr. Borge is going to address the Court as to his

14  remorse and his sorrow in what's happened, and I believe that

15  those issues will be stressed by Mr. Borge, but, your Honor,

16  there have been 40 colleges in the past three years that have

17  failed.  This is a problem that's systemic.  Mr. Borge didn't

18  cause the closure of the College of New Rochelle.  Perhaps if

19  Mr. Borge had opened his mouth and said we can't continue like

20  this in 2014, the College would have closed three years

21  earlier.  Mr. Borge acted based upon information that he was

22  provided by the administration.  Grants are going to increase.

23  Gifts are going to increase.  Enrollment is going to increase.

24          The last financial statement issued by the College

25  had more than $11 million of tuition receivables.  Those are

students who signed up, attended classes, but never paid their

tuition.   The amount of the restitution just from those tuition

bills in and of themselves would have been cut in half had the

money been available.

        So a monocular view that Mr. Borge's action caused

the demise of the College is extremely misplaced.

        It is with those words, your Honor, that I ask you to

listen to Mr. Borge, and I trust that whatever sentence the

Court does impose will be just and fair and will be fitting to

the acts that Mr. Borge committed.

        THE COURT:  Okay.  Thank you, sir.

        Now, Mr. Borge, this is your opportunity to say

anything you would like or present any information you would

like to present before I impose sentence.  So you're welcome to

do it, but, again, as I said to counsel, I have read what they

submitted and, more specifically, you, I read very carefully,

line by line, the letter that you submitted.  So, with that

comment having been made, you can go ahead and say anything you

want.  If you want.  You don't have to say anything if you

don't want to.

        THE DEFENDANT:  Yes.  Thank you, your Honor.

        I just want to apologize to you and the Court and --

        THE COURT:  You know what?  You don't have to

apologize to me.  I didn't suffer any loss here.  But go ahead.

Move on to the next thing you were about to say.  Probably

20198sborgs

1   there's someone else you want to apologize to.

2          THE DEFENDANT:  Yes.  I want to apologize to my wife

3   and my family, my sons.  I've hurt them so much by this.  Also,

4   the colleagues at the College of New Rochelle.  I'm truly sorry

5   for what I've done, your Honor.

6          I was really just trying to keep the College going.

7   I always had to deal with cash problems.  You know, it was --

8   it was something that was continually -- something that I

9   continually had to deal with.  I was pressured.  The

10  administration, the faculty, staff, vendors were always

11  screaming for cash and the College, unfortunately, didn't have

12  it.  There was no cash coming in.  Our enrollment had been

13  declining for quite some time.  And it got to the point where I

14  made a terrible decision.

15         I think I told you that I made in my life I think two

16  very tough decisions that are haunting me.  One was with my

17  father when he was -- I found -- I met him in the hospital when

18  he had suffered a stroke and a brain bleed and I thought I made

19  the right decision, did the right thing, by having him operated

20  on and it just didn't work, and he really had no quality of

21  life after that.  I think I've made the same decision here.  I

22  was trying to do it with my heart.  I was trying to, again,

23  keep the College going.

24         The College meant so much to me.  I worked there for

25  37 years.  I was involved in a lot of the College.  I provided

20198sborgs

a lot of good will for the College.  During that time, I really, really, really thought I was doing the right thing by trying to keep it going, your Honor.

I apologize for my actions.  I know I've hurt people. I've hurt myself.  But those actions were because I was just trying to keep the doors open so that students could graduate and that things were going to eventually get better.

I've ruined my life, your Honor, by these misguided decisions of trying to help the College.  My actions have caused devastating harm upon me and my family as well as others.  And I have a lovely, supportive family and friends.

I'm an honorable man, your Honor, a good husband, a good father to two wonderful sons, a good family man, and I've never broken any law.  I haven't even had tickets, traffic tickets.  My friends and family wrote you letters about my character, a character that they never questioned.

Your Honor, please allow me to continue to play an integral role with my family and my extended family.  My family means everything to me.

I'm retired.  I'm a trusted advisor.  I do a lot of work with my mother-in-law and my wife's aunt, who has Alzheimer's.  I'm really the person that's relied upon, and I'm available for them.  I help them with all their finances.  I help them with day-to-day activities.  I'm the one that's called upon because I'm available, your Honor.  Please allow me

20198sborgs

1    to continue that role I do with my family.

2              When I retired, I really wanted to do something,

3    volunteer work with my community.  I really did.  But this has

4    been weighing on my mind for such a long time.  Please, your

5    Honor, please allow me to have that opportunity to do better,

6    to make my life better, to be able to volunteer and do some

7    goodness in society, your Honor.

8              I'm sorry for my actions.  I'm sorry for what they

9    have caused, the pain they have caused.  I truly never wanted

10   to do this.  I only thought I was doing the right thing.

11             Thank you, your Honor.

12             THE COURT:  Okay.  Thank you, sir.  You may have a

13   seat.

14             Sentencing is always hard.  I'm not asking for any

15   sympathy from anybody.  It's just hard.  It's hard in every

16   case and certainly in this case.  And we have an adversary

17   system, and that means that we have adversarial arguments.  One

18   side says X, the other side says Y, and usually the right thing

19   to do is somewhere in between X and Y.  And certainly this case

20   exemplifies that.

21             Let me say first that, in deciding the appropriate

22   sentence in this case, I've considered all of the statutory

23   factors set forth in 18, United States Code, Section 3553(a).

24   One of those factors and what is usually the most important

25   factor, although not the only factor, but the most important

20198sborgs

1    factor, or sentencing consideration, is the facts and

2    circumstances of the offense.  And, here, what happened is that

3    the defendant willfully -- that's an important word --

4    willfully failed to pay over to the IRS and, as it happens, the

5    State of New York payroll taxes that had been withheld from the

6    College of New Rochelle's employees' paychecks.  In other

7    words, the money didn't go to the employees.  It was withheld

8    from their paychecks.  And because payroll taxes are due every

9    quarter, this conduct occurred repeatedly over an approximately

10   two-year period.

11          The amount of unpaid federal payroll taxes was more

12   than $13 million, although the remaining unpaid amount is a

13   little bit less than that.  And the total amount of the federal

14   and state income taxes and Social Security and Medicare

15   payments that the defendant willfully failed to pay exceeded

16   $20 million.  Now, that's a lot of money.

17          On top of that, over a period of years -- and this is

18   important, and it wasn't really addressed by defense counsel or

19   the defendant.  It was addressed at great length by Ms. Adolph.

20   On top of that, over a period of years, the defendant

21   manipulated the College's books and records to inflate accounts

22   receivable and investments, understate accounts payable.  And

23   really what it boils down to is all of this was done to conceal

24   the ever-increasing payroll tax liability.

25          As a result, the College's financial statements were

materially false, and those financial statements were provided

to investors interested in purchasing bonds issued by the

College.  And those investors relied on the financial

statements in making their investment decisions.  And these

financial statements were not just a little bit off.  In 2015

alone, the financial statement reported a total net assets of

$25 million -- net assets -- but the true number was more like

$1 million.  So it was 25 to 1.  And the parties have agreed

that the loss with respect to the fraud on investors was more

than $600,000.  That's a lot of money.  And that is completely

separate and apart from the tax loss.

        The defendant also went to great lengths to conceal

from the College's senior officers and Board of Trustees his

failure to pay over payroll taxes.

        You know, I actually believe you when you say that

you were loyal to and committed to the College and it meant so

much to you.  That's the gist of what you said.  I believe you.

But what I don't understand is why you weren't just totally

open and transparent about what you were doing and what the

problems were and the cash flow problems you were having.  So

this case is really more about concealment and deception.

That's kind of the underlying gist of what's going on here, and

it's incomprehensible to me.  But that is what happened.

        As I mentioned a moment ago, the defendant made

numerous false entries into the College's books and records.

20198sborgs

Plus, according to the unobjected-to facts in the PSR, on at
least two occasions, he gave his supervisor false documents to
show that he had paid the taxes when he had not and, on other
occasions, he falsely stated that he had made the payments.  We
heard about that from Ms. Adolph, but it's also in the
presentence report.  He also lied to internal investigators and
outside counsel.

By the way, I have no doubt that the College paid a
lot of money to those investigators and outside counsel to try
and sort this out.  But he lied to them.  The defendant lied to
those investigators and outside counsel about his failure to
file payroll tax returns and pay payroll taxes.

And he also blamed other people for his own failures.
And I think that's another theme about this case.  I think that
Mr. Borge is a very proud man and he was committed to the
College and when it became clear to him that he had failed, he
had failed to do whatever he could to save this institution,
that somehow that motivated him to cover that up, because he
didn't want to admit his own failures, his own lack of
competence or his own inability to make this all go away.  That
was really poor judgment.  But I think it's borne out of ego.
I think it's borne out of I just don't want to admit to myself
or other people, my colleagues, my boss, my underlings, my
wife, whatever, I don't want to admit to them that I'm not very
good at what I do, so I lie about it.  I conceal it.  I cover

20198sborgs

1   it up.  I retire.

2           Good for you.  You retired at age 60.  You know, if

3   you were really committed to this, you might have said, you

4   know what?  I can retire.  I would like to retire.  I would

5   like to start enjoying the golden years of my life.  I'm

6   entitled to do that just like anybody else, but I'm going to

7   stick it out.  I'm going to stay here and I'm going to make

8   sure this gets handled, and handled properly and openly and

9   honestly.  At a cost to me because then I won't be able to

10  enjoy my golden years, at least not for a while.  But you

11  didn't do that.  You said sayonara.  I'm out of here.  And then

12  later on, when you were asked about some of these things, like

13  I said before, you said, oh, no, no.  Yeah, I paid that.  I

14  think I paid that.  I might have paid that.  Well, it's his

15  fault.  No, it's his fault.  That's what I'm saying.  It's all

16  about concealment and covering up.  So that's all on the bad

17  side of the ledger, no pun intended.

18          Having said all of that, it also seems clear to me

19  that the defendant -- it is clear to me that the defendant did

20  not personally profit or obtain any financial gain from these

21  offenses, from these tax and security fraud offenses.  That, of

22  course, means -- under those circumstances, the question

23  arises, well, then, why did he do it?  What was his motivation?

24          Mr. Borge tells me that he did it to keep the

25  College, which was experiencing severe cash flow problems,

1    afloat and also to keep paying employees' salaries and other

2    expenses.  In other words, he deliberately and willfully failed

3    to pay over these payroll taxes and also made false entries in

4    the books and records, which get translated into financial

5    statements, which cause losses to investors, that he did all of

6    that in order to use the money that he would otherwise have

7    paid to pay other operating expenses and keep this thing going.

8            You know, this is not a Ponzi scheme, obviously, so

9    that analogy to a Ponzi scheme is a bad one, but what's

10   similar, in my view, anyway, about what Mr. Borge did and what

11   people that engage in Ponzi schemes do is they just keep those

12   balls in the air.  You know, they know that disaster is on the

13   horizon.  They don't want to admit that it's on the horizon, so

14   they just kind of, in a Ponzi scheme, steal from one person to

15   pay off another person, and they keep it going until eventually

16   it just collapses.  And that's, in some ways, what Mr. Borge

17   did.  He stole from Peter to pay Paul.  Right?  He stole from

18   the tax authorities in order to pay the employees and then said

19   to himself, well, that's a good thing.  The IRS doesn't need

20   the money.  Well, maybe they do, but, anyway, who really needs

21   the money is the employees, my friends, my colleagues, so we'll

22   keep that going until I have a chance to retire, and then I'm

23   out of here.  And, boy, I hope this all works out because I

24   don't want to hear from these folks again.

25           But I bet you, the day you retired, you knew you were

20198sborgs

going to be called out on this.  You knew the day you walked

out that door that there was going to come a time, probably not

in the too distant future, when the phone was going to ring and

somebody was going to say, Keith, what the heck is this?  We

just found out you didn't pay years worth of taxes.  You didn't

even file returns.  But you had your fingers crossed and you

were hoping, maybe even praying, that that wouldn't happen and

that everything would work out.  And, of course, it didn't.

          And now the College has closed its doors, which has

had and will continue to have a devastating effect on the

staff, the students, the alumni and the community.

          What did the staff lose?  Well, the staff lost their

jobs; in many cases, they're calling.  I understand a college

like this, it's a Catholic institution.  It's been around a

long time.  People who work for these places, they don't get

paid a bazillion dollars.  I know that's not an actual word.

Part of what they do is a calling.  They feel called to serve

in a institution like this.  And to be told, no, you know what,

you have to leave and we're turning out the lights, see you

later, it's got to be so devastating to them.

          The students.  I heard from a number of students.

They were there for a reason and now they're told, sorry, even

though you're doing everything that you've been asked to do,

you've got to leave and you've got to figure out some other

alternative.  You've got to transfer your credits, maybe.

20198sborgs

1    Maybe it will work.  Maybe it won't.  You've got to pay

2    somebody else to complete your education.  Maybe that will

3    work.  Maybe it won't.  Devastating to them.

4          The alumni.  I'm sure that an institution like

5    this -- this is true for many colleges, but certainly an

6    institution like this.  Alumni have a very close emotional

7    attachment to an institution like this and now it's gone.  Just

8    disappeared.

9          I'm a lifelong resident of Westchester County, and

10   I'm familiar, very familiar, with New Rochelle.  And what

11   happened to New Rochelle?  Well, New Rochelle lost the bedrock

12   of the community, a revered institution of higher education

13   that's been around for more than a hundred years.  That's a lot

14   of loss.

15         So, Mr. Borge, when you tell me that this is hurtful

16   to you and you feel like you've been affected by this and your

17   family has been affected by it, I believe you, but, you know

18   what?  Honestly, it pales in comparison to the losses that

19   other people have suffered; staff, alumni, students, the

20   community.  It pales in comparison.

21         So the question, then, is did the defendant's actions

22   cause the College to close.  Because if he said, look, I'm

23   going to do this because I want to destroy this institution,

24   well, then we would be having a different conversation right

25   now.  Clearly, that's not what happened here.  And the answer

20198sborgs

1    is just -- it's murky.  The answer to the question is -- the

2    question is did the defendant's actions cause the College to

3    close.  It's not an easy question to answer.  But what is clear

4    is that the College closed because its mountain of debt was

5    just too steep to climb.

6            So the next question is was this entirely the

7    defendant's fault.  I would say probably not.  It's not

8    entirely the defendant's fault.  But I am persuaded by both

9    common sense and life experience and the letters that I've

10   received from the President of the College, the members of the

11   Board of Trustees, the statement made today by Ms. Adolph, the

12   other letters that I've received, that, had they known earlier

13   in time of the magnitude of the problem, the real knowledge of

14   exactly what the magnitude of the problem was, if they had

15   known of that in a timely fashion, before it got so huge, which

16   they didn't know because of the coverup that the defendant

17   engaged in, they would have had time to cut expenses, increase

18   revenues, restructure debt, maybe even find a merger partner

19   and maybe -- not certainly, but maybe -- save the College.  But

20   by the time it came to light, the debt was too large and the

21   cost of servicing it was too great for the College to have time

22   to recover.

23           So did the defendant's actions at large contribute to

24   the closing of the College?  Yes, they did.

25           On the other hand, the College was already in poor

20198sborgs

1   financial shape when the defendant embarked on his pattern of

2   nonpayment and fraud and concealment.  And, indeed, those

3   financial problems were what led to the defendant's misguided

4   efforts to, as I said earlier, rob Peter to pay Paul.  And that

5   effort by the defendant showed monumentally poor judgment.  I

6   don't think there's any dispute about that.  But I can't quite

7   conclude that the College's closure was all Mr. Borge's fault.

8   Based on the record before me, I can reasonably conclude -- and

9   that's all I can do, reasonably conclude -- that the

10  defendant's criminal acts contributed significantly to the

11  College's closure, but it was not the sole cause.

12          And there was also a lot of discussion in the

13  submissions about whether the defendant acted alone.  Wasn't

14  much about that today.  Some.  But it appears to be his

15  position, well, you know, I did these things, but what about

16  this person or what about that person or she knew this or he

17  knew that.  There's a lot of saying, well, okay, I did it, but

18  so did other people.  I don't need to resolve that question.  I

19  don't need to resolve whether someone else is criminally

20  responsible, or even not criminally responsible, but,

21  nonetheless, responsible for the closing of the College.

22          The crime is not the closure of the College.  The

23  crime is the failure to pay payroll taxes and the securities

24  fraud.  Is there someone else who's arguably responsible for

25  those things?  Maybe.  I don't know.  It's not my job.  I don't

20198sborgs

1    need to resolve that in this case, in Mr. Borge's case, to

2    impose a fair and appropriate sentence today.  The defendant

3    has admitted committing these crimes.  He was clearly the

4    principal actor in these crimes.  He maintained tight control

5    over the Finance Department as Vice President for Finance and

6    as Controller.  This is how he had the opportunity to and the

7    ability to manipulate the books.

8            Also, according to the PSR -- and this is not

9    objected to -- in 2017, he told the SEC, which was

10   investigating the securities fraud aspect of this, that he did

11   not tell his superiors that he had not made the payroll tax

12   payments until after he had retired in 2016.  And, of course,

13   he also deceived the College's management and Board in the ways

14   that I mentioned earlier.

15           So is it possible that others knew about the

16   magnitude of the problems created by the defendant's failure to

17   pay over the payroll taxes?  I suppose so.

18           But that, I'm sorry to say for you, Mr. Borge, does

19   not at all diminish the seriousness of your own conduct.  And

20   that's why I don't need to resolve the question of whether you

21   acted alone.  Alone or not, what this defendant did -- what you

22   did -- was bad.  It was appalling.  It significantly

23   contributed to the closing of this hundred-year-old

24   institution.  It caused millions of dollars of losses to the

25   IRS and to New York State.  It caused hundreds of thousands of

20198sborgs

dollars of losses to bond investors.  And, of course, it caused

all the other -- or significantly contributed to the harm that

has befallen the staff, the students and the community.  And

all of that warrants a substantial prison sentence.

That still leaves open the question of how

substantial the prison sentence should be.  On the one hand,

the stipulated guidelines range is 97, which is about eight

years, to 121 months, which is about ten years, imprisonment.

And under the law, that is the starting point for determining

an appropriate sentence.

Mr. Auerbach has done what most defense lawyers do,

which is that they say, well, the guidelines are not binding.

Yes, that's true.  But you left out references to the numerous

Supreme Court cases which say over and over again -- when

district judges seem to ignore the guidelines as if they don't

matter at all and just start from zero and go from there,

they've said over and over again, no, no, no, that's not how

you do this.  First you figure out what the guideline range is.

Then you decide whether you want to vary, or depart in some

cases, but vary from that guideline range.  And if you do vary

from the guideline range, you better have a reason, they say to

the district judges.  And the bigger the variance, the bigger

the reason.  That's the way the guidelines work.  So we start

with eight to ten years and we go from there.

Now, there should be a variance here.  The government

20198sborgs

1    agrees with that and I agree with it, certainly, and that's

2    because this was a nonviolent crime.  The defendant has

3    otherwise led a lawful and productive life.  And,

4    importantly -- importantly -- his motivation was not to destroy

5    the College, but to save it, even if his actions contributed

6    significantly to its closing.  Plus, he did not personally

7    profit or cause others to profit from his actions.

8            And, indeed, under the fraud guideline here -- again,

9    I'm not starting from scratch.  I'm determining the sentence

10   based on the law, including the guidelines.  Under the fraud

11   guideline, 2B1.1, the determination of the sentencing range is

12   driven primarily by the amount of loss, which, in this case, is

13   over $20 million, but the guideline does acknowledge that there

14   may be cases in which the offense level, based on the amount of

15   loss, substantially overstates the seriousness of the offense.

16   I think this is one of those cases.

17           I think the offense level, 30, which is based

18   primarily, but not entirely, on the amount of loss,

19   substantially overstates the seriousness of Mr. Borge's

20   criminal conduct because the defendant didn't profit and his

21   motivation, however short-sighted and misguided, was to keep

22   the College open and running for the benefit of its students,

23   staff, alumni and the community as well.

24           So, under all these circumstances, I believe that a

25   substantial downward variance is warranted, and the sentence I

20198sborgs

1   intend to impose is 36 months imprisonment -- that's three

2   years -- to be followed by three years of supervised release.

3   And, also, even though the probation officer didn't recommend

4   it -- I really can't quite figure out why it wasn't

5   recommended -- I am imposing a substantial fine in this case,

6   $25,000, which is supposed to be painful.  It's punishment.

7   And according to your financial circumstances as described in

8   the PSR, you can pay that.  It will be painful.  You won't like

9   paying it, your family won't like paying it, but you're going

10  to pay it.  So that's what I'm going to impose as well.  And

11  I'm going to impose restitution in the amounts requested by the

12  government in their proposed restitution order.

13          I believe that, taken together, that sentence is

14  sufficient, but not greater than necessary to comply with the

15  purposes of sentencing set forth in Section 3553(a).

16  Specifically, given the nature and circumstances of the offense

17  and the history and characteristics of the defendant, the

18  sentence I intend to impose is sufficient, but not greater than

19  necessary to reflect the seriousness of the offense, to promote

20  respect for the law, to provide just punishment for the

21  offense, to afford adequate deterrence to criminal conduct, and

22  to provide restitution to any victims of the offense.

23          Does either counsel know of any legal reason why the

24  sentence should not be imposed as stated?

25          Mr. McMahon?

20198sborgs

1          MR. McMAHON:  The only thing I would note, Judge, is

2     I don't think you included the special assessments.

3          THE COURT:  I will include it, but putting that aside

4     for a minute, is there any legal reason why the sentence that

5     I've told you I intend to impose should not be imposed as

6     stated?

7          MR. McMAHON:  No.

8          THE COURT:  Same question to you, Mr. Auerbach.

9          MR. AUERBACH:  No, your Honor.

10          THE COURT:  Mr. Borge, please stand.

11          It is the judgment of this Court that you be

12     committed to the custody of the United States Bureau of Prisons

13     for a total term of 36 months to be followed by three years of

14     supervised release.  This sentence is imposed on each count to

15     run concurrently.

16          The standard conditions of supervised release 1 to 12

17     shall apply.  They're in the presentence report.  They will

18     also be in the judgment.

19          The following mandatory conditions shall apply.

20     They're on page 30 of the PSR.  I have to read them into the

21     record, so bear with me.  You must not commit another federal,

22     state or local crime.  You must not unlawfully possess a

23     controlled substance.  You must refrain from any unlawful use

24     of a controlled substance.  You must cooperate in the

25     collection of DNA as directed by the probation officer.  And

1    you must make restitution in accordance with 18, United States

2    Code, Sections 3663, 3663A and 3664.  By the way, that's agreed

3    to in the plea agreement; the fact of restitution, not the

4    specific amount.

5            The following special conditions of supervised

6    release also apply.  They're on page 31.

7            1.  You must provide the probation officer with

8    access to any requested financial information.

9            2.  You must not incur new credit charges or open

10   additional lines of credit without the approval of the

11   probation officer unless you are in compliance with the

12   installment payment schedule.

13           3.  You shall be supervised by your district of

14   residence.

15           I am imposing a fine in the amount of $25,000, which

16   is relevant here because this is a substantial downward

17   variance from the guideline range primarily for two reasons.

18   The motivation was not to harm the College and Mr. Borge did

19   not profit at all from doing this.  But I think part of that

20   variance -- in lieu of an additional jail sentence, I certainly

21   think that a substantial fine is appropriate, so that's why I'm

22   imposing that fine.

23           I am imposing restitution.  The total amount is

24   $13,261,204.40.  I did that addition myself.  I think that's

25   correct.  And that will be pursuant to the order that the

20198sborgs

1   government has submitted.

2           So you're obligated to make that restitution payment.

3   I realize it's a lot of money.  And I'm sure you hope and

4   everybody hopes that there's money in that college and in its

5   property that will largely, if not completely, satisfy the

6   taxing authorities.  Of course, separate and apart from that is

7   the securities fraud.

8           In any event, restitution is to be paid in monthly

9   installments of at least $500 over the period of supervision to

10  commence 30 days after release from custody.  That doesn't mean

11  you just pay $500 a month for three years and you're done.

12  That restitution obligation is akin to a judgment.  So you are

13  obligated to pay the total amount of money unless there's some

14  reason not to, which the most obvious reason would be if it was

15  paid by somebody else.

16          I am imposing the mandatory special assessment of

17  $100 per count for a total of $200, which is due immediately.

18          The foregoing constitutes the sentence of the Court.

19          You may have a seat, sir.

20          You have the right to appeal your sentence subject to

21  any limitations on that right contained in your plea agreement

22  with the government.  If you are unable to pay the cost of an

23  appeal, you may apply for leave to appeal without payment of

24  costs.  A notice of appeal must be filed within 14 days after

25  the entry of judgment; therefore, if you do wish to appeal, you

20198sborgs

must advise your attorney to prepare and file a notice of

appeal immediately or, if you request, the clerk will

immediately prepare and file a notice of appeal on your behalf.

There are no open counts.  Am I right about that?

MR. McMAHON:  There are none.

THE COURT:  Mr. Auerbach, I routinely include in a

judgment the recommendation to the Bureau of Prisons that the

defendant be housed as close as possible to his home to

facilitate family visits, of course, so I'm going to put that

in there unless you tell me not to.

MR. AUERBACH:  No, your Honor.  And we're cognizant

of the fact that it's a recommendation and it's not binding

upon the Bureau.

THE COURT:  Right.  But it's certainly a good

recommendation.

Is there any other recommendation you would like me

to include?

MR. AUERBACH:  I don't believe so, your Honor.

Obviously, due to the nature of the offenses involved, whatever

minimum security facility there is.

THE COURT:  Well, that's reflected at great length in

the presentence report.  I'm not going to make any specific

recommendation about that.  He's not going to be put in a

medium or high-security prison.  There's zero chance of that

happening.  Plus, it's also relevant that his sentence is not

20198sborgs

1   particularly long.  If you're a major fraudster and you get 50

2   years, you're probably going to be in a higher-security

3   facility, but, in this case, it's spelled out with great

4   clarity what he did and what he didn't do, meaning he didn't

5   take any money for himself, importantly, and the sentence is

6   such that I'm reasonably confident that he's going to end up at

7   a minimum-security facility.  Can't guarantee it, but I'm

8   confident he will.  I'm not going to put that in as a

9   recommendation.  Okay?

10          MR. AUERBACH:  Thank you, your Honor.

11          Your Honor, there is one point as to the restitution

12  order.

13          THE COURT:  Sure.

14          MR. AUERBACH:  We had conversation yesterday

15  afternoon with the U.S. Attorney's Office about some language

16  modification in the proposed order to account for those matters

17  which were addressed in my letter to the Court and which will

18  be uploaded today, and we would like an opportunity just to

19  confer with the U.S. Attorney's Office prior to the Court's

20  execution of the order.

21          THE COURT:  That's fine.  I have no problem with

22  that.

23          Are you willing to consider some modifications?  I

24  mean, basically, he just doesn't want to -- you know, it's not

25  crazy that he would think, well, look, these are obligations of

20198sborgs

1    the College, or the institution, and the College is going to be

2    sold or the property is going to be sold, and so some of that

3    money presumably is going to go to a very big creditor, i.e.,

4    the IRS and the State.  It's not crazy.  I don't know how you

5    would reflect that in an order, but --

6         MR. McMAHON:  Your Honor has basically said he

7    doesn't have to start paying until he's on supervised release.

8    Hopefully, by then, that issue will be resolved.  And,

9    obviously, he'll get credit for any payments the College makes.

10   Maybe we could put some language like that in there.  So I'm

11   happy to confer with Mr. Auerbach about that.

12        THE COURT:  Why don't you confer.  I don't have to

13   sign it today.  I intend to sign an order of restitution more

14   or less along the lines of what you submitted, but if there's

15   some agreement as to the language, I'm perfectly happy with

16   that.  So if you submit a revised proposed order, just make it

17   clear that this is a revised proposed order that is being

18   submitted with the consent of the defendant so that we don't

19   have to reconvene a hearing to discuss it.

20        Now, of course, a possibility is that you won't come

21   up with an agreement and, honestly, I'm prepared to enter the

22   order of restitution as it's currently framed, but I'm

23   encouraging you to try and meet Mr. Auerbach halfway and come

24   up with something that's satisfactory to him.

25        MR. McMAHON:  We'll do that.

20198sborgs

1          THE COURT:  So get back to me in no later than a week
2     with respect to that.
3          MR. AUERBACH:  Thank you, your Honor.
4          THE COURT:  Is that okay, Mr. Auerbach?
5          MR. AUERBACH:  Thank you, your Honor.
6          THE COURT:  Finally, Mr. Borge has been out on bail
7     pending the outcome of this case.  Ordinarily people that have
8     been sentenced start serving their sentence immediately,
9     meaning they go into custody immediately.  Are you asking for
10    that to be held off?  In other words, are you asking for a
11    direct surrender date?
12         MR. AUERBACH:  Yes, your Honor.
13         THE COURT:  Any objection to that?
14         MR. McMAHON:  No objection.
15         THE COURT:  There's been no violations of the
16    conditions of release as far as I know.
17         MR. McMAHON:  No, there haven't.
18         THE COURT:  And I certainly don't expect any to
19    happen in the future.
20         What I ordinarily do is set that date 45 days out,
21    which, by my calculation, is -- this might be 44 days, but it's
22    a Friday -- October 11th, 2019 at 2 p.m. at an institution to
23    be designated by the Bureau of Prisons.
24         That means, wherever they tell you to go, you have to
25    show up there no later than 2:00 on that day.  Is that clear?

20198sborgs

1          THE DEFENDANT:  Yes, your Honor.

2          THE COURT:  And if you don't show up, then there are

3    different problems that you're going to have like maybe a new

4    charge for bail jumping.

5          In the meantime, all of the conditions of your

6    release on bail will continue.  So they still apply.  You still

7    have to not commit any new crimes and everything else.  All the

8    other conditions that you were released on in the first place

9    continue to apply.  Do you understand that?

10          THE DEFENDANT:  Yes, your Honor.

11          THE COURT:  Okay.  Is there anything else we need to

12    do today?

13          MR. McMAHON:  No, your Honor.

14          MR. AUERBACH:  No, your Honor.

15          THE COURT:  Mr. Borge, I recognize this is tough for

16    you.  I get it.  Honestly, as I said earlier, I think it's a

17    lot tougher for a lot of other people than it is for you.  So I

18    wish you the best of luck.  And I hope you appreciate that the

19    decisions you made in this case were not only misguided, but

20    they were criminal, they had consequences, and today is the day

21    that you are being held to account for that.

22          Have a good day.

23

24                              ----

25